PEATROSS, J.
 

 11 Plaintiffs, Connie M. McKay, John McKay and Rose Mary Campbell, appeal the summary judgment of the trial court finding that a garage policy issued by Colony Insurance Company (“Colony Insurance”) did not provide coverage for the defendant/driver, Albert Kyle “Sonny” Mills, III. For the reasons stated herein, we affirm.
 

 FACTS
 

 On July 31, 2006, Plaintiff Connie McKay was driving in a southerly direction on Highway 153 in Richland Parish. Plaintiff Rose Mary Campbell was a passenger in Ms. McKay’s vehicle. As Ms. McKay’s vehicle traveled through the intersection of Highways 135 and 137, it was struck from the side by a 1980 Peterbilt tractor/trailer driven by Albert Kyle “Sonny” Mills, III. Sonny had been unable to stop the rig at the stop sign at the intersection and collided with Ms. McKay’s vehicle, allegedly causing extensive property damage and injury to Ms. McKay and Ms. Campbell.
 

 
 *1160
 
 The circumstances surrounding how Sonny came to be driving the Peterbilt tractor/trailer at the time of the accident are of import to the coverage question before us. The record reveals that, on the day of the accident, Sonny was assisting his brother, Clifton Mills, in cutting and hauling grain. According to Sonny’s deposition testimony and Clifton’s deposition testimony, Clifton owned one Feightliner truck and two trailers that were available to haul loads that day. There had apparently been discussions between Clifton and Max Livingston, who worked with and drove trucks for Clifton, about purchasing a second semi-truck to carry the additional trailer to improve the efficiency of their harvesting. On the day 12of the accident at issue, Mr. Livingston traveled to Anvil Enterprises, owned by David A. Donnell, and returned with the Peterbilt truck, without a trailer attached, to haul the second trailer owned by Clifton. When Mr. Livingston arrived with the Peterbilt truck, the men hooked a trailer to the truck, loaded the trailer with milo and decided that Sonny would “try out” the truck and drive the load to the elevator. Sonny testified regarding his purpose in driving the Peter-bilt truck:
 

 Q: Did you know one way or another whether this truck had been purchased?
 

 A: I was told that the truck was going to be — we were supposed to try— haul a load with it and see if we liked the truck, make a load with it and see what I thought about the truck, if they should buy it or not. As far as I was understood by Mr. Max, he told me before he left, he opened the glove box and said, “In this coffee can right here is the title and your insurance if anything is to happen; this is all the information you’ll need if you get a ticket or an accident or anything.” I forget how he worded that, but he showed me the coffee can that contained the papers on the truck.
 

 Sonny further clarified that he and Clifton both agreed that purchasing an additional truck would benefit the harvesting operation and that he was to “take the load to the elevator and tell [Clifton] ... whether it was worth buying or not.”
 

 Albert Kyle Mills, Jr., Sonny’s and Chi-ton’s father, accompanied Mr. Livingston to Anvil Enterprises to pick up the Peter-bilt truck. Mr. Mills testified that Mr. Livingston contacted him about the Peter-bilt truck and it was Mr. Mills’ belief that “we didn’t know whether we were going to buy it or not ... we were going to try it out.” There is some discrepancy in the testimony of Mr. Mills and Mr. Livingston regarding who spoke with whom |sat Anvil Enterprises when the two men picked up the Peterbilt truck, but there is no dispute that Clifton was to be the ultimate purchaser and the men were taking the truck to test it prior to Chiton’s making the purchase. Clifton testified that it was his understanding that “we were trying the truck out ... we were under no obligation to buy it.”
 

 Mr. Livingston testified in his deposition that he and Mr. Mills went to Anvil Enterprises to get the truck because Clifton was working in the field. Mr. Livingston drove the Peterbilt truck from Anvil Enterprises to the farm where Clifton was working, assisted in hooking up the trailer to the semi and Sonny then took over operation of the rig. As previously stated, the accident occurred while Sonny was driving the rig to the elevator.
 

 Plaintiffs filed suit against several defendants, including Colony Insurance, which had issued a garage policy of insurance to Mr. Donnell, d/b/a Anvil Enterprises. The policy contains an exclusion from coverage for customers of the business, defining an insured as follows:
 

 
 *1161
 
 3. Who Is An Insured
 

 a. The following are “insureds” for covered “autos”:
 

 (1) You for any covered “auto”.
 

 (2) anyone else while using with your permission a covered “auto” you own, hire or borrow except:
 

 * * *
 

 (d) Your
 
 customers,
 
 if your business is shown in the Declarations as an “auto” dealership....
 

 (Emphasis added.)
 

 |4The Declarations page of the garage policy under “Item One” contains a printed request for information labeled, “Business Description:.” In the blank that follows, the information provided by Mr. Donnell reads “Dealer (T02) Car Dealer 12200.”
 

 Colony Insurance filed a motion for summary judgment on the issue of coverage based on the above exclusion. The trial court granted the motion and this appeal ensued.
 
 [1]
 

 DISCUSSION
 

 Appellate courts review summary judgments
 
 de novo
 
 under the same criteria that govern the district court’s consideration of whether summary judgment is appropriate.
 
 Elliott v. Continental Cas. Co.,
 
 06-1505 (La.2/22/07), 949 So.2d 1247. When determining whether or not a policy affords coverage for an incident, it is the burden of the insured to prove the incident falls within the policy’s terms. On the other hand, the insurer bears the burden of proving the applicability of an exclusionary clause within a policy.
 
 Broadmoor Anderson v. National Union Fire Ins. Co. of Louisiana,
 
 40,096 (La.App.2d Cir.9/28/05), 912 So.2d 400,
 
 writ denied,
 
 05-2462 (La.3/24/06), 925 So.2d 1239.
 

 Summary judgment declaring a lack of coverage under an insurance policy may not be rendered unless there is no reasonable interpretation of the policy, when applied to the undisputed material facts shown by the evidence supporting the motion, under which coverage could be afforded.
 
 Elliott, supra, citing Reynolds v. Select Properties, Ltd.,
 
 93-1480 (La.4/11/94), 634 So.2d 1180.
 

 An insurance policy is a contract between the parties and should be construed employing the general-rules of interpretation of contracts set forth in the Louisiana Civil Code.
 
 Elliott, supra.
 
 The parties’ intent, as reflected by the words of the policy, determines the extent of coverage.
 
 Id.
 
 Words and phrases used in a policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning. An insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. Where the language in the policy is clear, unambiguous and expressive of the intent of the parties, the agreement must be enforced as written.
 
 Id.
 
 If, however, after applying the other rules of construction an ambiguity remains, the ambiguous provision is to be construed against the drafter and in favor of the insured.
 
 Id.
 

 The purpose of liability insurance is to afford the insured protection from damage claims. Policies, therefore, should be construed to effect, and not to deny, coverage. Thus, a provision which seeks to narrow the insurer’s obligation is strictly construed against the insurer; and, if
 
 *1162
 
 the language of the exclusion is subject to two or more reasonable interpretations, the interpretation which favors coverage must be applied. It is equally well settled, however, that, subject to the above rules of interpretation, insurance companies have the right to limit coverage in any manner they desire, so |(ilong as the limitations do not conflict with statutory provisions or public policy.
 
 Elliott, supra citing Commercial Union Insurance Co. v. Advance Coating Co.,
 
 351 So.2d 1183 (La.1977).
 

 The rule of strict construction does not authorize a perversion of language, or the exercise of inventive powers, for the purpose of creating an ambiguity where none exists, nor does it authorize the court to make a new contract for the parties or disregard the evidence as expressed, or to refíne away terms of a contract expressed with sufficient clearness to convey the plain meaning of the parties.
 
 Elliott, supra; Commercial Union Insurance Co., supra.
 
 Thus, for summary judgment to be warranted, there must be no reasonable interpretation of the policy, when applied to the undisputed material facts shown by the evidence supporting the motion, under which coverage could be afforded.
 
 Elliott, supra.
 

 On appeal, Plaintiffs argue that 1) the customer exclusion does not apply in this case because Mr. Donnell did not use the exact phrase “auto dealership” to describe his business on the Declarations page of the policy and, alternatively 2) Sonny was not a customer of Mr. Donnell’s within the meaning of the exclusion because he did not have contact with anyone at the dealership and was merely driving the Peterbilt truck at the request of his brother. We do not find either argument presented by Plaintiffs to be persuasive.
 

 Applicability of Exclusion
 

 The limiting provision in the commercial garage policy purchased by Mr. Donnell is a commonly found provision that expressly excludes 17customers of an automobile dealership in its definition of an insured, unless the customer does not have liability insurance of his own or is statutorily underinsured.
 
 Alexander v. Cornett,
 
 42,147 (La.App.2d Cir.7/11/07), 961 So.2d 622,
 
 writ denied,
 
 07-1681 (La.11/2/07), 966 So.2d 603. La. R.S. 22:1291
 
 [2]
 
 provides that the driver’s personal liability policy is primary in “test drive” circumstances at auto dealerships and these garage policies are designed to meet the minimum liability insurance requirements under the state’s compulsory insurance law by providing liability insurance in cases where the driver is uninsured or underinsured.
 

 We find no basis, in public policy or in the insurance policy itself, on which to distinguish between the descriptions of “Dealer” or “Car dealer” and “auto dealership” for purposes of a garage policy of insurance. Mr. Donnell operates as a sole proprietorship and described his business in the policy as “Dealer” and “Car dealer.” Plaintiffs base their argument on the fact that the exclusion applies by its express terms to “your customers, if your business is shown in the declarations as an ‘auto’ dealership.” Plaintiffs argue that the terms “Dealer” and “Car dealer” are not the same as “auto dealership.” Since Mr. Donnell failed to call his business an
 
 “auto
 
 ” dealership, Plaintiffs claim that his customers are not excluded from coverage under the garage policy. We find this to be a distinction without a difference and conclude that the exclusion from coverage applies to customers of Mr. Donnell’s.
 

 
 *1163
 

 IsApplication of Exclusion to Sonny
 

 Having found the exclusion applicable, we now turn to the question of whether Sonny qualifies as a customer of Anvil Enterprises for purposes of the exclusion. In finding that Sonny
 
 was
 
 a customer and, therefore, not an insured under the policy, the trial court relied on the decision of this court in
 
 Marshall v. Seago,
 
 41,138 (La.App.2d Cir.6/28/06), 935 So.2d 752. We held in
 
 Marshall
 
 that a person test driving an automobile is a customer for purposes of a garage policy even where that person is not the actual purchaser who will execute the sale and own the vehicle. In
 
 Marshall,
 
 the grandmother was purchasing a vehicle for her grandson. While the salesman at the car dealership dealt primarily with the grandmother, the grandson test-drove the car and was involved in a collision while driving the vehicle. Faced with the question of whether the grandson was a customer under the policy even though he was not the actual purchaser, we found the two individuals to be so interrelated as to be the same for purposes of a “customer” as contemplated by the garage policy. Since the grandson was test-driving the vehicle for purposes of his grandmother’s purchase decision, he was an extension of the ultimate purchaser and, thus, was a customer and not an insured under the policy.
 

 Plaintiffs attempt to distinguish
 
 Marshall
 
 from the instant case by pointing out that Sonny had no contact with anyone at Anvil Enterprises, but was simply driving the tractor at the request of his brother. According to Plaintiffs, the circumstances are dramatically different from those in
 
 Marshall
 
 and it should not be controlling herein. We disagree. The |9testimony reveals that the Peterbilt truck was being driven by those associated with Clifton in order to assist him in deciding whether or not to purchase the truck. This court has clearly held that an individual test-driving a vehicle on behalf of a potential purchaser is a test-driver or customer for purposes of this exclusion.
 
 Marshall, supra.
 
 Accordingly, we conclude that the trial court properly granted summary judgment in favor of Colonial Insurance.
 

 CONCLUSION
 

 For the foregoing reasons, the summary judgment in favor of Defendant, Colony Insurance Company, is affirmed at the cost of Plaintiffs, Connie M. McKay, John McKay and Rose Mary Campbell.
 

 AFFIRMED.
 

 [1]
 

 . There were cross motions for summary judgment filed in the trial court-the instant motion filed by Colony Insurance and a second motion filed by another insurer on the issue of primary versus secondary coverage. The only judgment before us on appeal is the one granting summary judgment in favor of Colony Insurance.
 

 [2]
 

 . Renumbered from R.S. 22:671 by Acts 2008, No. 415, § 1, eff. Jan. 1, 2009. Added by Acts 1988, No. 756, § 1. Amended by Acts 1997, No. 1060, § 1.